[No. G040702. Fourth Dist., Div. Three. Mar. 30, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK MARTIN BOJORQUEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

**COUNSEL**

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Emily R. Hanks, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARONSON, J.**—In this case, we affirm defendant Frank Martin Bojorquez's convictions of consensual sexual activity with a confined adult (Pen. Code, § 289.6, subd. (a)(2); all statutory references are to this code), based on his conduct while supervising community work release participants at a county animal shelter. For the reasons explained below, we reject defendant's argument that the sexual activity did not occur in a "detention facility" within the meaning of section 289.6.

In the unpublished portion of this opinion, we conclude substantial evidence supports defendant's convictions of sexual penetration and oral copulation by official threat to incarcerate. (§§ 289, subd. (g), 288a, subd. (k).) We therefore affirm the judgment.

I

### FACTUAL AND PROCEDURAL BACKGROUND

At the time of the incidents involved in this case, the county and sheriff maintained a work release program, known as the Community Work Program (CWP). According to a deputy sheriff assigned to the program, the county established the CWP to ease jail overcrowding. Nonviolent, low-risk inmates sentenced to county jail with terms of 150 days or less could volunteer for the program and work in lieu of jail confinement. Deputies screened and assigned participants to one of several locations, including the Orange County Animal Care shelter, adjacent to Theo Lacy men's jail in Orange. Participants earned one day against their sentence by working eight to 10 hours. Except when they were at the shelter, workers "were free to do . . . [as they] pleased." A significant number of eligible females opted to participate in the CWP. On any given day during the relevant time period, up to 10 CWP participants worked at the shelter.

CWP participants signed a two-page document called the "Community Work Program Rules and Regulations" (CWP rules). The CWP rules advised that while at work, "you will be in the custody of the Orange County Sheriff's Department. Laws, rules and regulations that pertain to an in-custody inmate will apply to you . . . ." The CWP rules admonished that failure to comply "will result in being turned away by the Work Crew Supervisor or being returned to custody." The rules required reporting to work on time and on the days indicated, and dressing in suitable work clothes. Participants carried a document containing their booking number. Workers usually wore bright orange neon vests lettered with "CWP." Participants generally worked outside of public view and did not interact with the public. CWP workers generally were assigned to "station three," which included the clinic and euthanasia room. Workers also cleaned cages and animal control officers' trucks.

CWP participants were told to stay in a designated break area in between job assignments unless they had to use the restroom. The CWP rules provided for search and seizure during the workday by law enforcement officials, not worksite supervisors, and prohibited drugs, alcohol, cigarettes, visitors, and communication with unauthorized persons. The CWP rules also barred telephone calls, horseplay, gambling, and unsafe activity. Workers were required

to bring a lunch and could not leave the worksite at lunchtime. The CWP rules provided the worker was "expected to work as ordered and instructed by the Work Crew Supervisor. Disrespect to the supervisor or failure to perform any assigned duty will result in being returned to custody." Participants were required to obtain a supervisor's initials at the end of every workday.

Workers were obligated to document excused absences for illness or court appointments. CWP participants missing work were directed to contact CWP staff immediately or an arrest warrant would issue. An excessive number of unexcused absences would result in removal from the CWP and reincarceration. Deputies visited worksites daily and spoke to site supervisors.

The CWP Inmate Supervisor Policy and Procedure Manual specified that anyone supervising CWP workers must submit to a thorough background check, complete a class on supervising inmates, and carry a certification card. The manual directed supervisors to "maintain strict compliance with the Sheriff's Department rules and regulations regarding the handling and supervision of CWP workers." The manual further stressed the importance of keeping relationships "on a supervisory level. Never discuss personal matters or maintain any type of personal relationship with CWP inmates." CWP rules prohibited physical contact with participants, and rule 2.12 specified, "At no time whatsoever will you have any sexual contact with any inmate."

Defendant was one of four regular employees with the title "Kennel Attendant II." He was not an "officially . . . titled" CWP supervisor and did not have a certification card. His responsibilities nonetheless included supervising female CWP workers and he was "out there every day working" with them. According to the shelter's director, a Kennel Attendant II had responsibilities in station three, had daily contact with CWP workers, and oversaw their work.

*Elyse K.*

Elyse K. began working at the shelter October 7, 2005, after pleading guilty to grand theft. Defendant met her and the other CWP workers at the gate, handled their paperwork, and briefed them on their duties. He referred to the women as "sweetie," "honey" and "baby" and Elyse repeatedly asked him to stop. Three days after she started, defendant asked her to help him in the cat isolation trailer. The doors were locked, but defendant had a key. The dark, narrow trailer had two fairly high windows, and required working in close quarters. Defendant "accidentally" elbowed Elyse in the chest while retrieving supplies from a shed. He jumped and a shelf fell down. He explained, "Look, you get next to me I get all excited and frustrated. Look what you do to me."

The incident made her uncomfortable and she told defendant "that's just not cool." Based on this incident and because he seemed "very flirtatious with a lot of the girls," she switched to working weekends when defendant did not work. On the first or second weekend, Elyse told a female supervisor, Bernita Sanchez, about the trailer incident.[1] Elyse made an official report to a CWP deputy sheriff on her last day at the shelter in December 2005. She did not file an earlier report because she feared if she caused problems she might have to serve the remainder of her sentence in jail.

As a result of his activity with Elyse K., the jury convicted defendant of misdemeanor attempted consensual sexual activity with a confined adult (§ 289.6 [count 1]) and misdemeanor sexual battery (§ 243.4, subd. (e)(1) [count 2]).

*Jamie S.*

Jamie S. pleaded guilty to forgery and received a nine-month jail sentence. A former drug user, she previously had served time in jail and prison for theft and burglary and had worked in a CWP. She found incarceration dangerous and degrading. After serving four months, she volunteered for the CWP. Participation in the program meant she could work at other jobs on nights and weekends, and spend time with her family. She worked at the shelter from January to July 2005. Defendant was friendly and flirtatious and she was friendly in return. She described him as acting "like a very G.Q. Mexican, a very good looking guy who could have what he wanted." He would get the workers lunch, allow them into his air-conditioned office on warm days, and let Jamie leave early for her night job.

Jamie became concerned when observing defendant's interaction with the other female workers. He would not leave a CWP worker named Fawn S. alone and he played favorites. Jamie told a female employee "something [was] going on here" and she did not like it, but begged the employee not to say anything because she did not want to return to jail.

About three months after she started at the shelter, Jamie and defendant were in a trailer when he grabbed her hand and tried to put it on his crotch. She pulled away. About a month later, he approached her in a storage room, grabbed her shoulders, and tried to kiss her. She told him she was busy and needed in another area. On another occasion she accompanied Fawn to the cat isolation trailer, but defendant sent Jamie away after allowing Fawn inside. Defendant often told Jamie she was beautiful, but she would laugh it off.

---

[1] Sanchez denied Elyse made a report.

Jamie complained about the program to a neighbor, Deputy Sheriff Jeff Brown, but asked him not to say anything. In December 2005, Brown and Sheriff Investigator Tracy Morris interviewed Jamie at jail after she was arrested for driving under the influence. They arranged for her to speak to defendant on the telephone and recorded the call. Defendant told her to say nothing happened and everything would be fine. About a month later, Jamie pleaded guilty and received a 90-day sentence.

In the counts naming Jamie as the victim, the jury convicted defendant of misdemeanor attempted consensual sexual activity with a confined adult (§ 289.6 [count 3]), but acquitted him of felony attempted sexual battery by restraint (§ 243.4 [count 4]).

*Phyllis W.*

Phyllis W. pleaded guilty to drug charges and received a 90-day jail sentence. A recidivist, she spent part of her sentence in jail before entering the CWP in November 2004. As the end of her time approached, she and defendant were joking around in a trailer where the animal food was stored. Defendant exposed his penis, asked her to touch it and grabbed her hand. She told him to stop because if they got caught she would have to go back to jail. He told her not to worry about it. She told an investigator this behavior occurred on several occasions in various locations, including the cat isolation trailer and the surgery center. She also described another incident when he grabbed her head as if she was giving him oral sex, and another worker came around the corner. He pressed himself against her on a few occasions and masturbated in front of her four or five times. She observed defendant go into the trailer with other women and she spoke about defendant's behavior with Fawn S. and Jamie S., but never reported the incidents because she feared no one would believe an inmate's word against a supervisor's, and she would be sent back to jail.

Another CWP worker, Lisa H., testified she inadvertently interrupted Phyllis and defendant upon entering a storage room. It appeared to her Phyllis was orally copulating defendant. She did not report the incident because it was "none of [her] business." Defendant allowed Lisa to leave early that day.

On the counts involving Phyllis, the jury convicted defendant of misdemeanor consensual sexual activity with a confined adult. (§ 289.6 [count 5].) The trial court acquitted defendant of the count charging felony sexual battery by restraint. (§ 243.4, subd. (a) [count 6].)

*Fawn S.*

Fawn S., convicted of drug use and commercial burglary, was admitted to the CWP and began working at the shelter in late December 2004. Defendant

made sexual advances soon after she started. While she was cleaning out litter boxes in the cat isolation trailer, defendant kissed her on the neck and had his hands around her waist trying to touch her breast. She told him to stop. Although afraid, she did not report the incident because she hoped he would not do it again, and did not want to cause problems. Defendant began touching and kissing her on a daily basis. He rubbed against her and sat on a table and masturbated in front of her twice. He often remarked how "hot" she was, and on one occasion, he placed his erect penis against her back and whispered in her ear, "[D]on't worry we can have sex, I'm fixed." On another occasion, he tried to put his hand in her pants, but she pushed him away.

Fawn testified that after she returned from an absence to attend her grandfather's funeral, defendant called her into his office and said he "wasn't going to play this game anymore. Either I was going to have sex with him, or go to jail." She walked out and did not return to the shelter. Fawn was later arrested for possessing methamphetamine for sale and received a prison sentence.

On the counts involving Fawn, the jury convicted defendant of misdemeanor consensual sexual activity with a confined adult. (§ 289.6 [count 7].) The trial court dismissed a count charging defendant with felony sexual battery by restraint. (§ 243.4, subd. (a) [count 6].)

*Maria R.*

Maria R. testified she pleaded guilty to commercial burglary and received a 20-day sentence. She had never been to jail and feared being incarcerated. After about three days in jail, she volunteered for the CWP and began working at the shelter in early December 2005. On her first day, defendant told her to work with him in the cat cage. When she entered the room, he closed the door and began masturbating. He touched her breasts and inserted his fingers into her vagina several times. She told him to stop because "they were going to see." Defendant said he was her friend, he was "playing" and liked "to do this kind of stuff." The incident lasted about 10 or 15 minutes. Defendant warned her not to tell anyone.

Another day, defendant pulled down his pants and said he wanted to have sex. She pushed him away. He may have touched her vagina. He tried to pull down her sweatpants and had his penis out touching the area near her belly button. He told her not to say anything. She told an investigator defendant warned her on the first day of work he would report her if she did not follow his directions. She told her sister about defendant's sexual advances, but did not report the incident to anyone at the shelter because she was an undocumented alien and she feared authorities would send her back to jail.

As to Maria, the jury convicted defendant of felony sexual penetration by threat to use the authority of a public official to incarcerate, arrest, or deport. (§ 289, subd. (g) [count 9].)

*Elizabeth M.*

Elizabeth M. pleaded guilty to drug crimes and worked at the shelter between October and December 2004. A few weeks after she started, she became concerned when defendant began making flirtatious comments and gestures concerning her appearance. While she was cleaning the cages in the cat isolation trailer, defendant approached her from behind and starting rubbing her breast. She asked him to stop. He said "it will be okay, don't worry about it." He told her she would not get in trouble. She again asked him to stop and he responded, "[I]t's okay. [I] will take care of [you]." Starting to cry, she asked him to stop and said she was not comfortable, but he continued to grope her, placing his hand under her clothing and touching her vagina. She did not report the incident because she was afraid.

A second incident occurred a few days later when defendant asked her to help him euthanize some cats. Once alone, he tried to kiss her lips and mouth. When she told him to stop, he said it would be all right, and touched her breasts over her clothing. He stopped when someone opened the door. Again, she did not report the incident because she was scared.

On another occasion, Elizabeth was cleaning the cat isolation trailer with another CWP worker when defendant ordered the other worker to leave. Elizabeth was on her knees cleaning a cage when defendant approached her, exposed his penis, pressed it against her lips, and inserted it into her mouth. He grabbed the back of her head and held her head in place. Elizabeth began to cry. Defendant masturbated and ejaculated on the floor. He said to her, "It will be all right." He also told her not to worry because he would take care of her.

Defendant started touching her sexually on a weekly basis. Once, he attempted to kiss her and grope her breasts. Another time, he grabbed her hand to touch his penis. Elizabeth confronted defendant, complaining his behavior was wrong because he was married and his wife also worked at the shelter. Defendant replied it would be all right and she would not get in trouble.

Elizabeth was transferred and completed her CWP assignment at a different location. She reported the incidents to law enforcement after seeing a story about defendant's arrest in the newspaper in January 2006.

In the counts concerning Elizabeth, the jury convicted defendant of two felony counts of consensual sexual activity with a confined adult (§ 289.6

[counts 10 and 11]), felony sexual battery by restraint (§ 243.4, subd. (a) [count 12]), felony oral copulation accomplished by threatening to use the authority of a public official to incarcerate, arrest, or deport (§ 288a, subd. (k) [count 13]), and felony sexual penetration by threatening to use the authority of a public official to incarcerate, arrest, or deport (§ 289, subd. (g) [count 14]).

*Defendant's Statements*

Defendant spoke to Sheriff Investigator Tracy Morris in January 2006. He denied forcing anyone at the shelter to have sex with him, but conceded exposing his penis numerous times in the context of sexual horseplay initiated by the women, "because . . . they were making fun of me saying ha . . . you know like you can't do this . . . they're . . . showing me what they have." He admitted having a "little affair" with Phyllis. He said their sexual activity consisted of mutual oral copulation, sexual intercourse, and numerous incidents of foreplay in which he touched her breasts or put his fingers in her vagina. He ejaculated about eight times with Phyllis, and she masturbated him a couple of times. He admitted exposing himself to Fawn three times, touching her vagina seven or eight times, and putting his fingers in Fawn's vagina a few times. He ejaculated once with Fawn. With Jamie, he admitted grabbing her hand and putting it on his penis over his pants, kissing her, and giving her his phone number.

At trial, the jury convicted defendant of the offenses noted above. The court sentenced defendant to an aggregate term of five years in prison.[2]

II

DISCUSSION

A. *Defendant Was Properly Convicted of Engaging in Sexual Activity with a Consenting Adult Confined in a Detention Facility*

Defendant contends we must reverse his convictions for consensual sexual activity with a confined adult because the incidents did not occur in a detention facility. We reject defendant's narrow reading of section 289.6. For the reasons explained below, we conclude defendant's sexual activity with the CWP workers at the county animal shelter fits within the criminal conduct proscribed by the statute.

---

[2] The court imposed a three-year low term for the felony oral copulation conviction involving Elizabeth (count 13), and a consecutive two-year term for sexual penetration involving Maria (count 9). The court imposed concurrent low terms for the other felonies (counts 10, 11, 12, and 14) and concurrent jail terms for the misdemeanor convictions (counts 1, 2, 3, 5, and 7).

Section 289.6 provides, in relevant part, "(a) . . . [¶] (2) An employee or officer of a public entity detention facility, or . . . agent of a public or private entity under contract with a detention facility, . . . who engages in sexual activity with a consenting adult who is confined in a detention facility, is guilty of a public offense. [¶] . . . [¶] (c) As used in this section, the term 'detention facility' means: [¶] (1) A prison, jail, camp, or other correctional facility used for the confinement of adults or both adults and minors. [¶] (2) *A building or facility used for the confinement of adults or adults and minors pursuant to a contract with a public entity.* [¶] (3) A room that is used for holding persons for interviews, interrogations, or investigations and that is separate from a jail or located in the administrative area of a law enforcement facility. [¶] (4) A vehicle used to transport confined persons during their period of confinement. [¶] (5) A court holding facility located within or adjacent to a court building that is used for the confinement of persons for the purpose of court appearances." (Italics added.)

Defendant asserts he was wrongly convicted under this statute because the county animal shelter fits none of the five definitions of "detention facility" set forth in subdivision (c) of section 289.6. The Attorney General responds that one of these statutory definitions does indeed apply: The county animal shelter is "[a] building or facility used for the confinement of adults or adults and minors pursuant to a contract with a public entity." (§ 289.6, subd. (c)(2).)

Defendant challenges the contention that the county animal shelter was "used for the confinement of adults" within the meaning of the statute.[3] He gives two reasons why the shelter was not used for such "confinement." First, the shelter's purpose is to house and treat animals; its use as a work release site is purely incidental. Second, no physical restraints prevented the CWP workers from leaving the animal shelter. In other words, defendant asserts the CWP workers were not confined because they were "free to walk out."

The first argument is unpersuasive. Only one of the statute's five definitions of "detention facility" refers to traditional venues for holding inmates. (See § 289.6, subd. (c)(1) ["[a] prison, jail, camp, or other correctional facility"].) The definition at issue here is undeniably broader and open-ended. With its generic reference to "a building or facility" contractually used for the confinement of persons, the definition in subdivision (c)(2) could include

---

[3] At oral argument, defendant raised for the first time a question as to whether the CWP at the shelter was operated "pursuant to a contract with a public entity." (§ 289.6, subd. (c)(2).) Evidence at trial established that the Orange County Sheriff's Department operated the CWP at the animal shelter, a county facility under the jurisdiction of the Orange County Health Care Agency, pursuant to an agreement between the two public entities, satisfying the "contract" requirement.

such things as so-called "pay-to-serve" private lockup facilities run by private companies under contract with municipalities, and other alternative sites for confinement that public entities may embrace in this era of overcrowded prisons and jails. Section 289.6, subdivision (c)(2), does not state the "building or facility" must be used *exclusively* for the confinement of persons. Thus, the fact the animal shelter is only secondarily used for that purpose does not by itself disqualify it from the statute's reach.

Defendant's second argument as to the lack of barriers or other physical restraints keeping CWP workers inside the animal shelter presents a more difficult issue: What is meant by the *confinement* of persons as that term is used in section 289.6, subdivision (c)(2)?

Defendant argues that the absence of iron bars and armed guards at the animal shelter necessarily means the CWP workers were not *confined* within the meaning of the statute. The Attorney General, on the other hand, contends the Legislature intended "confinement" to have a broader meaning, extending the protection of section 289.6, subdivision (a)(2), to inmates serving time in alternative facilities with restrictions on liberty that fall short of the traditional indicia of imprisonment, such as bars, guards, and "24/7" incarceration. The statute itself does not define "confinement." We must therefore determine its meaning by applying settled rules of statutory construction. The issue is one of law subject to de novo review. (*People v. Akhile* (2008) 167 Cal.App.4th 558, 562 [84 Cal.Rptr.3d 236].)

██ " 'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.] '[W]e begin with the words of a statute and give these words their ordinary meaning.' [Citation.] 'If the statutory language is clear and unambiguous, then we need go no further.' [Citation.]" (*People v. Sinohui* (2002) 28 Cal.4th 205, 211 [120 Cal.Rptr.2d 783, 47 P.3d 629] (*Sinohui*).)

The Attorney General asserts the word "confinement" as used in section 289.6 has a plain, ordinary and unambiguous meaning, as demonstrated by the common dictionary definitions of the word which include both imprisonment and the wider notion of restraint of liberty or restriction in movement. (See, e.g., Webster's 3d New Internat. Dict. (1993) p. 476; Black's Law Dict. (8th ed. 2004) p. 318, col. 1.) Rather than establishing a single, ordinary meaning, however, these dictionary definitions confirm the term's ambiguity within the context of the statute. Because confinement can be reasonably interpreted to mean either actual imprisonment, as defendant suggests, or a circumstance involving restrictions short of imprisonment, as the Attorney General asserts, we turn to time-honored statutory interpretation aids to help us to determine the Legislature's intent in using "confinement" in section 289.6.

■ "If . . . the language supports more than one reasonable construction, we may consider 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.] Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*Sinohui, supra*, 28 Cal.4th at pp. 211–212.)

As will be shown, the rather extensive legislative history of section 289.6 supports a construction of "confinement" that comports with the more expansive definition proposed by the Attorney General, rather than the narrower definition urged by defendant.

The bill enacting section 289.6 originated in the Assembly in 1994. (Stats. 1994, ch. 499, § 1, p. 2691.) The author of the bill explained that it was "intended to prohibit peace officers or employees of a law enforcement agency [from] engag[ing] in sexual activity with a prisoner housed in a detention facility," in the same way that other laws make "it a crime for a doctor or psychotherapist to have sexual relations with his or her client or former client." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1568 (1993–1994 Reg. Sess.) Aug. 12, 1994, p. 2.) In an analysis recommending the governor sign the bill, an executive branch agency stated: "Sexual activity between inmates and peace officers or law enforcement personnel is inappropriate. Inmates in detention facilities are under the custody and care of peace officers, correctional officers, and other law enforcement personnel. Given this relationship, inmates may be vulnerable to being taken advantage of. In addition[,] a sexual relationship between an inmate and a guard may compromise the security of the facility. By criminalizing *consensual* sexual activity between guards and inmates, this bill discourages such activity and punishes those who take advantage of inmates and compromise the security of the facility." (Cal. Council on Crim. Just., Off. of Criminal Justice Planning, Enrolled Bill Rep. on Assem. Bill No. 1568 (1993–1994 Reg. Sess.) Aug. 16, 1994, p. 1, original italics.)

The Legislature amended the statute in 1997 to add acute psychiatric hospitals and other specified residential health facilities, where physically and mentally disabled persons are involuntarily confined, to the list of facilities where employees cannot engage in sexual activity with confined persons. (Stats. 1997, ch. 209, § 1, p. 931.) According to the author of the bill, "Patients in locked facilities and inmates are particularly vulnerable to coercion for sexual demands. A claim of consent is ludicrous and should be barred under those circumstances." (Sen. Com. on Public Safety, analysis of Assem. Bill No. 685 (1997–1998 Reg. Sess.) as introduced, p. 3.)

A Senate analysis of the 1997 bill echoed these concerns about the particular vulnerability of confined persons. The analysis stated that sexual activity between correctional officers and inmates in detention facilities "is analogous to statutory rape . . . . Both types of offenses—statutory rape and sex between a correctional employee and a detained person—arguably are rooted in a policy aimed at an imbalance of power between the parties so significant as to vitiate any purported consent." (Sen. Com. on Public Safety, analysis of Assem. Bill No. 685 (1997–1998 Reg. Sess.) as introduced, p. 4.) In arguing for the proposed expansion of the law to apply to "acute psychiatric facilities and facilities caring for developmentally disabled persons," the analysis asserted that "the basic policy issue underlying the current law applies equally to the health facilities proposed to be added by this bill: that there is an inherent imbalance of power between the perpetrator and the victim." (*Ibid.*)

An Assembly committee analysis of the proposed 1997 amendment elaborated on the particular vulnerability of women confined in institutions. The analysis pointed out that " '[w]omen are raped and molested in institutions just as they are outside, perhaps more. . . . But for women in institutions, credibility is an even greater problem than for women on the outside. They are terrified to report sexual abuse by those in power because of the possibility of retaliation and the virtual certainty of being disbelieved.' " (Assem. Com. on Public Safety, analysis of Assem. Bill No. 685 (1997–1998 Reg. Sess.).) Of course, testimony in this case validates the expressed legislative concern. Several of defendant's victims testified they submitted to his sexual demands and did not report his behavior because they thought authorities would not believe them and would instead send them back to jail.[4]

Section 289.6 was amended yet again in 1999 to, among other things, extend the reach of the statute by adding volunteers and contractors in detention facilities to those subject to criminal penalties for engaging in sexual activity with confined persons, and adding "parolees" to those protected by the statute. (Stats. 1999, ch. 806, § 4, p. 5891.) An Assembly

---

[4] One excerpt of legislative history concerning the 1997 amendment supports defendant's contention that section 289.6, subdivision (c)(2), applies only to places of actual imprisonment. The Senate analysis contained the following sentence: "One important difference between the kinds of facilities addressed in current law and those proposed by this bill is *detention*; those facilities proposed by this bill are not necessarily locked facilities, and patients in them are not necessarily 'confined.' " (Sen. Com. on Public Safety, analysis of Assem. Bill No. 685 (1997–1998 Reg. Sess.) as introduced, p. 4, original italics.) This sentence implies that the "facilities addressed in current law" are "necessarily locked facilities." We do not find this sentence determinative on the question, however, given its erroneous assertion as to the nature of the "health facilities" covered by the law under the proposed amendment. Rather than facilities in which patients "are not necessarily 'confined,' " all of the health facilities specified under section 289.6, subdivision (a)(1), are ones "in which the victim has been confined involuntarily." (§ 289.6, subd. (a)(1).)

analysis stated, " 'The problem of sexual misconduct of staff and others in state and local detention facilities is a serious and invidious institutional problem. Inmates, parolees, wards and detainees committed to the jurisdiction of the DYA, the CDC, the Department of Mental Health or any local law enforcement agency are a particularly vulnerable population to persons in positions of authority over them who would abuse that authority to engage in sexual acts with them, whether consensual or not.' " (Assem. Com. on Public Safety, analysis of Sen. Bill No. 377 (1999–2000 Reg. Sess.).)[5]

The foregoing legislative history is revealing. In enacting, and repeatedly amending, the statute, the Legislature fashioned a tool for preventing the sexual manipulation of persons rendered particularly vulnerable because of their status as *confined* persons held within the custody and control of institutions. The Legislature recognized that it is *confinement* itself, with its accompanying sense of "powerlessness" vis-à-vis one's custodian, that creates vulnerability and triggers the need for protection. Consequently, this statute, originally enacted to protect inmates from sexual coercion at the hands of their jailers, was amended repeatedly to extend its protection to more persons (involuntarily confined psychiatric patients and other disabled patients, parolees) and to punish more categories of perpetrators (health care employees, detention facility contractors, and volunteers). As for inmates, the Legislature signaled its view that confinement is not limited to traditional sites of incarceration, such as prisons or jails. Instead, the Legislature made the protections of section 289.6, subdivision (a)(2), applicable to persons confined in a variety of places and situations by including *five* definitions of "detention facility," only one of which refers to traditional correctional facilities. (See § 289.6, subd. (c)(1)–(5) ["detention facility" includes interview and interrogation rooms "separate from a jail" and "vehicle[s] used to transport confined persons"].)

With this legislative history in mind, we cannot conclude the Legislature intended the protections of section 289.6, subdivision (a)(2), to apply only to inmates held in detention facilities with iron bars, armed guards and "24/7" lockup procedures. It is more reasonable to construe "confinement" within the meaning of this subdivision to include custodial arrangements, like the CWP at the county animal shelter, in which inmates are subjected to restrictions and regulations under the supervision and control of facility employees who wield the sort of power over their charges that puts the inmates at risk for sexual coercion by a supervisor, and thus in need of the statute's protection.

---

[5] Section 289.6 was amended in 2000 to update references to "sexual penetration" contained in section 289.

To test the reasonableness of our conclusion that the CWP work areas within the county animal shelter were "used for the confinement of adults" (§ 289.6, subd. (c)(2)), we briefly review the applicable facts. The CWP rules warned workers, "From the time you arrive at the work site and until you are dismissed for the day, you will be in the custody of the Orange County Sheriff's Department. Laws, rules and regulations that pertain to an in-custody inmate will apply to you . . . ." The CWP workers were admitted into the animal shelter through a gate and required to stay within the gated and barbed-wire-enclosed facility until their 10-hour workday ended; they could not leave during the lunch break. They carried a document containing their booking number and wore bright orange neon vests lettered with "CWP." They generally worked outside of public view and were prohibited from interacting with the public. Their movements within the animal shelter were restricted. If not working on an assigned task, they were required to remain in a designated area. The CWP rules provided for search and seizure during the workday and prohibited drugs, alcohol, cigarettes, horseplay, visitors, and telephone calls. The CWP rules required the worker to "work as ordered" by the supervisor: "Disrespect to the supervisor or failure to perform any assigned duty will result in being returned to custody."

■ Taken in their totality, these conditions at the CWP animal shelter worksite constitute "confinement" within the meaning of section 289.6, subdivision (c)(2). The CWP rules confined the CWP inmates to a fixed locale, restricted their liberty within the premises, and subjected them to the authority and control of supervisors wielding the power to return them to jail. These conditions created the same type of disparity in power, and resulting vulnerability to sexual demands, which the Legislature determined can lead to the sexual manipulation of inmates in prisons and jails. Consequently, applying the provisions of section 289, subdivision (a)(2), to the CWP at the animal shelter furthers the statute's purpose of deterring such abuses. For that reason, we conclude the animal shelter was a "facility used for the confinement of adults" within the meaning of section 289.6, subdivision (c)(2).

In resisting this conclusion, defendant relies on a literal interpretation of the word "confinement" as it is used in section 4024.2, the statute authorizing community work release programs. Essentially, defendant contends the language in the statute declaring that time served in work release is "in lieu of . . . confinement" determines *for all purposes* that a work release placement does not constitute "confinement." Though this argument has superficial appeal, it fails upon closer examination.

The pertinent language in section 4024.2 is as follows: "Notwithstanding any other law, the board of supervisors of any county may authorize the sheriff or other official in charge of county correctional facilities to offer a

voluntary program under which any person committed to the facility may participate in a work release program pursuant to criteria described in subdivision (b), *in which one day of participation will be in lieu of one day of confinement.*" (§ 4024.2, subd. (a), italics added.)

Defendant's argument based on this language begins with the unobjectionable assertion that something done "*in lieu* of confinement" cannot *be* confinement; instead, the two concepts are mutually exclusive. It does not logically follow, however, that this statutory language in section 4024.2 determines that CWP participation cannot constitute "confinement" for purposes of section 289.6, subdivision (c)(2).

■ The fallacy in defendant's argument is that it ignores the specific context in which the word "confinement" is used in section 4024.2. (See *People v. Braxton* (2004) 34 Cal.4th 798, 810 [22 Cal.Rptr.3d 46, 101 P.3d 994] [words of a statute "should be construed in their statutory context"].) The statute allows counties to create their own voluntary work release programs that give inmates specified sentence credit for time served in work release ("one day of participation will be in lieu of one day of confinement" (§ 4024.2, subd. (a)) so long as the work release program meets specified conditions. These statutory conditions regulate such things as the type of work performed and the hours of labor required. (See § 4024.2, subd. (b)(1)(A) ["Manual labor" improving public facilities such as parks and schools], (b)(1)(C) "[graffiti cleanup"], (b)(1)(D) ["weed and rubbish abatement"], (b)(4) ["each day shall be a minimum of 8 and a maximum of 10 hours"].) Thus, the statutory declaration that a day's participation in work release is "in lieu of one day of confinement" conveys only the Legislature's intent to give the inmate the benefit of a full day's credit toward completion of his or her sentence for every day spent in work release—a bargain, considering "one day of confinement" is 24 hours while a day in work release is eight to 10 hours. The word "confinement" in this context says nothing about whether any particular work release program constitutes "confinement" for purposes of section 289.6.

■ The Attorney General aptly points out the anomalous results of interpreting "confinement" in section 4024.2 to mean that voluntary work release participants are not confined for purposes of section 289.6. The Attorney General notes that section 4024.2 is not the only statute authorizing work release programs. Section 4024.3 authorizes any county to create *mandatory* work release programs when the county's correctional system reaches capacity. Section 4024.3 does not include the phrase "one day of participation will be in lieu of one day of confinement." In fact, the word "confine" does not appear in section 4024.3. If that phrase in section 4024.2 is interpreted in a way that excludes voluntary work release participants from

the protection of section 289.6, then California would be in the anomalous position of extending section 289.6 protections to participants in mandatory work release, but denying those same protections to participants in voluntary work release. Fundamental to our task in construing an ambiguous statute is presuming that " ' "the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences." ' [Citation.]" (*California School Employees Assn. v. Governing Bd. of South Orange County Community College Dist.* (2004) 124 Cal.App.4th 574, 587–588 [21 Cal.Rptr.3d 451].)

Two appellate decisions have held that participation in a section 4024.2 work release program does not amount to "custody" for purposes of earning presentence custody credits or conduct credits. (See *People v. Wills* (1994) 22 Cal.App.4th 1810 [27 Cal.Rptr.2d 925] (*Wills*); *People v. Richter* (2005) 128 Cal.App.4th 575 [27 Cal.Rptr.3d 198] (*Richter*).) These cases could conceivably provide some support for defendant's argument that work release does not constitute confinement for any purpose. But neither *Wills* nor *Richter* is apposite to the issue before us. Instead, the holding of each case is limited to the context of calculating sentence credits.

In *Wills, supra*, 22 Cal.App.4th 1810, the defendant received probation for a drug offense, but later was sent to prison for violating the terms of his probation. The defendant appealed, claiming the trial court failed to award him conduct credits under section 4019 for the time he spent in a county work release program under section 4024.2. Although by its terms section 4019 applies only when "a prisoner is confined in or committed to a county [or city] jail, industrial farm, or road camp" (§ 4019, subd. (a)), and the defendant "lived at his girlfriend's home and worked at a senior citizen's center" while on work release, the defendant argued he nonetheless was entitled to conduct credits because section 4024.2 provides that each day of participation in a work release program is " 'in lieu of one day of confinement.' " (*Wills*, at p. 1812.) In other words, the defendant asserted that if days participating in work release are deemed "in lieu of" confinement for purposes of section 4024.2, then the same understanding must apply for determining whether the defendant should receive credit for those days under section 4019.

The *Wills* court rejected the argument on the ground that section 4019, subdivision (f), "makes it clear the Legislature did not intend to make available conduct and work time credits unless the probationer is 'in actual custody.' " (*Wills, supra*, 22 Cal.App.4th at p. 1813.) Moreover, the court held that a work release participant is not "in actual custody" for purposes of section 4019 as a matter of law, based on the provision in section 4024.2 authorizing a peace officer to " '*retake the person into custody* . . . to complete the remainder of the original sentence' " in the event the "participant fails to appear for work or even fails to work as assigned." (*Wills*, at

p. 1813, italics added.) In light of that provision, the court observed that "[n]o possible reading of section 4024.2 would support the conclusion" a work release participant "is *in actual custody* for the purpose of section 4019 conduct and work credits." (*Wills, supra*, at p. 1813, original italics.)

In *Richter, supra*, 128 Cal.App.4th 575, the trial court sentenced the defendant to prison after revoking his probation. The defendant appealed his sentence, arguing the trial court erred in failing to grant him custody credits under section 2900.5 for time he spent in a county work release program. Just as in *Wills*, the defendant based his claim of entitlement to presentence credits on the language of section 4024.2. The defendant argued that "because the work release statute specifies that 'one day of participation [in work release] "will be *in lieu of* one day of confinement"' . . . the time spent in work release entitles him to custody credit." (*Richter*, at p. 579.) The court rejected the defendant's claim, adopting essentially the same analysis set forth in *Wills*.

The *Richter* court began by noting that "[w]hile 'in lieu of' may mean 'in place of[,]' it does not mean appellant was 'in custody.'" (*Richter, supra*, 128 Cal.App.4th at p. 579.) The court further noted that "for an inmate to get any custody credits under section 2900.5, he must actually be *in custody*." (*Ibid.*)[6] The court went on to rely explicitly on the reasoning in *Wills* that a work release participant is not "'in actual custody'" for purposes of earning presentence credits because section 4024.2 provides that "'a peace officer may "retake the person into custody . . . to complete the remainder of the original sentence"'" for violating the terms of work release. (*Richter, supra*, 128 Cal.App.4th at pp. 579–580, quoting *Wills, supra*, 22 Cal.App.4th at p. 1813.) The *Richter* court concluded that because "a work release participant is not in custody[,] . . . custody credits should not be given to a defendant for time spent in a work release program under section 4024.2." (*Richter, supra*, 128 Cal.App.4th at p. 580.)[7]

The decisions in *Wills* and *Richter* analyzed the provisions of section 4024.2 solely to determine whether work release participation is "custody" entitling participants to conduct credits under section 4019 (*Wills*) or custody credits

---

[6] Section 2900.5 provides, in pertinent part, as follows: "[W]hen the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment . . . ." (§ 2900.5, subd. (a).)

[7] As further support for this conclusion, the court cited the statute governing *mandatory* work release programs, section 4024.3, which specifically provides that participants are entitled to custody credits. "Thus, the Legislature knew exactly how to provide custody credits under a work release program and expressly chose not to do so under section 4024.2." (*Richter, supra*, 128 Cal.App.4th at p. 580.)

under section 2900.5 (*Richter*). Neither case determines whether work release might constitute custody, or more to the point, "confinement," for any other purpose.

*Wills* and *Richter* are not dispositive because the terms "confinement" and "custody" are used in various ways throughout the Penal Code and case law. For example, case law holds that persons on work furlough from jail are in "custody" for purposes of the statute punishing escape. (*People v. Haskins* (1960) 177 Cal.App.2d 84, 86–87 [2 Cal.Rptr. 34]; see also *People v. Labrum* (1972) 25 Cal.App.3d 105, 108–109 [101 Cal.Rptr. 602] ["temporary community release" is custody for purposes of escape statute].) In another example, the California Supreme Court has held that an inmate who has been temporarily transferred *from* prison to a state hospital for mental health treatment is "confined in a state prison" for purposes of section 4501.5, which punishes battery on a nonprisoner by a person "confined in a state prison." (*People v. Watson* (2007) 42 Cal.4th 822, 824–825 [68 Cal.Rptr.3d 769, 171 P.3d 1101].) Finally, even the two sentence credit statutes at issue in *Wills* and *Richter* define custody differently. Section 4019 narrowly defines custody for conduct credit purposes as confinement in a jail, industrial farm, or road camp. (§ 4019, subd. (a).) Section 2900.5 defines custody for custody credit purposes in more expansive terms, including stints in a work furlough facility, halfway house, rehabilitation facility, or hospital. (§ 2900.5, subd. (a).) These examples underscore the importance of considering the statutory context when interpreting a particular term. Here, the meaning of "confinement" as used in section 4024.2, or as limited by *Wills* and *Richter*, does not dictate whether work release constitutes "confinement" for purposes of section 289.6.

Despite a valiant effort, defendant fails to dissuade us from our conclusion that the county animal shelter was a "facility used for the confinement of adults" within the meaning of section 289.6, subdivision (c)(2). We are convinced that interpreting "confinement" broadly to include the work release program at the county animal shelter serves the legislative purpose of deterring the sexual abuse of persons in custody by their custodians. For all the above reasons, we affirm defendant's convictions for engaging in sexual activity with a confined person under section 289.6, subdivision (c)(2).

B. *Substantial Evidence Supports Defendant's Convictions for Oral Copulation and Sexual Penetration by Threat**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 407.

## III

### DISPOSITION

The judgment is affirmed.

O'Leary, Acting P. J., and Moore, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 17, 2010, S182028.